# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT ERWIN, | ) | |
| | ) | No. 11 CV 1555 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | August 30, 2012 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Before the court is Scott Erwin's motion for summary judgment challenging a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB"). Erwin alleges that he is disabled due to severe back pain stemming from injuries he sustained in an ATV accident coupled with a degenerative disc disease of the lumbar spine. For the following reasons, Erwin's motion is granted and the case is remanded for further proceedings consistent with this opinion.

### Procedural History

Erwin filed his application for DIB on July 30, 2008, alleging a disability onset date of November 21, 2007. (Administrative Record ("A.R.") 113.) The Commissioner denied his claims initially and on reconsideration. (Id. at 61, 70-73.) Erwin then requested, and was granted, a hearing before an administrative law judge ("ALJ"). After considering Erwin's testimony and medical evidence, the ALJ concluded that he is not disabled as defined in the Social Security Act. (Id. at 30.) When the Appeals Council denied his request for review,

(id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). On March 4, 2011, Erwin filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Erwin traces his disability allegations to his involvement in a June 2006 ATV accident, in which he suffered spinal compression fractures. According to Erwin, in the years since the accident, he has experienced persistent back pain of a severity that makes it impossible for him to work full-time. At his February 2010 hearing before an ALJ, Erwin provided both documentary and testimonial evidence in support of his claims.

### A. Erwin's Medical Evidence

Erwin submitted medical records documenting that as a result of his 2006 ATV accident he suffered compression fractures at vertebrae T11 and T12, which are thoracic vertebrae located at the bottom of the middle segment of the vertebral column. (A.R. 282, 293, 324, 437.) In December 2007 Erwin had an MRI of his lumbar spine just below T11 and T12, which revealed the discs at L3-L4, L4-L5, and L5-S1 were "desiccated." (Id. at 294.) It also revealed "superior compression deformity of T11 and T12," although the reviewing physician found no "convincing evidence of acute abnormality." (Id. at 294-95.) Neurological tests were abnormal and suggestive of "L5/S1 lumber sacral radiculopathy"—or nerve irritation caused by vertebral disc damage, in layman's

terms—"still in acute phase." (Id. at 329.) His attending physician filled out a report describing him as "unable to work at all until further notice." (Id. at 330.)

On January 15, 2008, Dr. Theodore Eller observed that his review of Erwin's MRI scan showed that his compression fractures had "satisfactorily healed" since a December 2007 MRI, but noted that "there are degenerative changes throughout the lumbar spine." (Id. at 282.) Dr. Eller also observed that Erwin had "an antalgic posture when seated or when standing," meaning a posture assumed so as to lessen pain. (Id.) Dr. Eller noted that he was not confident that surgery could relieve Erwin's pain, but wrote that losing about 150 pounds and going through physical therapy were viable non-surgical treatments. (Id. at 283.)

Three months later, Dr. Sara Holz, an examining orthopedist, diagnosed Erwin with an L4/L5 annular tear and a T11/T12 chronic compression fracture. (Id. at 349-50.) She described him as battling severe pain in the low back and numbness in his legs, and noted that "any activity increases his pain." (Id. at 349.) Dr. Holz observed that "going from a seated to a standing position, he has difficulty with pain." (Id. at 375.) She recommended that he engage in physical therapy and gave him a prescription for a lumbar corset. (Id. at 350.) Shortly thereafter, Erwin began attending physical therapy with Chamberlin DeWitte. (Id. at 393.) DeWitte noted that Erwin had a sitting and standing tolerance of 15 to 20 minutes and observed that "all hip mobility is painful around the hip joint and into the patient's low back." (Id.) She observed that Erwin had "difficulty relaxing and maintaining any position" while she was evaluating him. (Id. at 394.)

In May 2008 Erwin sought emergency-room treatment for his back pain, which he said he had exacerbated when reaching to pick up some soap. (Id. at 296.) The emergency-room doctor ordered a spinal x-ray which revealed mild compression deformities of T11 and T12 and degenerative changes, but "no evidence of acute pathology." (Id. at 297.) Two weeks later Erwin underwent an MRI of his lumbar spine. (Id. at 290.) Dr. Matthew Dodaro reviewed the results, noting that the test revealed T11 and T12 compression deformities without significant change, a diffuse disc bulge at L3-L4, a broad-based posterior disc protrusion at L4-L5, and a focal disc protrusion at L5-S1. (Id.) Dr. Dodaro described Erwin's condition as "[s]table degenerative disease of the lower lumbar spine without significant foraminal or central canal stenosis." (Id.) A second reviewing doctor described Erwin as having a small bone spur at L4 and mild compression deformities at T11 and T12, and described his condition as "stable." (Id. at 292.)

In May and June 2008 Erwin again sought treatment for his pain from Dr. Holz. She noted that Erwin had "difficulty getting off and on the examination table" and was "unable to sit comfortably on the examination table." (Id. at 360, 358.) She also noted that for Erwin, "some days are good and some days are bad." (Id. at 360.) Holz referred Erwin to Dr. Paul Anderson for a surgical consultation. (Id. at 324.) Dr. Anderson noted that Erwin was "very obese" and moved "with a lot of facial grimacing." (Id.) He reported that light touching throughout the dorsal spine induced significant pain and described his impression as being that Erwin has chronic pain syndrome as a result of the fractures at T11 and T12. (Id. at 324-325.) Dr. Anderson did not see Erwin as a good surgical candidate and described

Erwin as exhibiting a "significant amount of pain behavior." (Id. at 325.) He recommended that Erwin be treated in Comprehensive Pain Management and that he lose weight. (Id.)

In September 2008 Erwin had an MRI of his left knee, revealing that he had torn his left-knee ACL that had to be repaired surgically. (Id. at 425.) That same month consulting physician Charles Kenney completed a residual functional capacity ("RFC") assessment after reviewing Erwin's file. (Id. at 412-19.) Dr. Kenney considered Erwin's descriptions of his back pain and mobility loss to be "partially credible," but said that the extent of his described limitations is not supported by the objective medical findings. (Id. at 419.) Dr. Kenney opined that Erwin has the RFC to sit for about six hours and stand or walk for at least two hours in an eight-hour work day. (Id. at 413.)

Two months after Erwin's knee surgery, his surgeon, Dr. Vincent Cannestra, reported that Erwin's "left knee is essentially back to normal," but noted that Erwin's "primary complaint is low back pain." (Id. at 441.) In December 2008, Dr. Cannestra met with Erwin to discuss treating his back pain. Erwin reported experiencing severe low back pain and tail bone pain, with numbness and tingling that radiates into both legs, especially on the right side. (Id. at 438.) Dr. Cannestra reviewed Erwin's x-rays and determined that they show degenerative disc changes in the thoracic and lumbosacral spine, and an old healed compression fracture at T11 and T12. (Id. at 437.) Noting that conservative management had failed Erwin, Dr. Cannestra recommended a CAT scan and epidural steroid injections. (Id.)

In December 2009 and January 2010 Erwin met with Dr. Jeffrey Oken to discuss his back pain. Erwin described his pain as being at a level of seven out of ten and reported that it is made worse with any activity. (Id. at 507, 509.) Erwin also reported sleep problems, saying that the pain interfered with his ability to sleep for more than two or three hours a night. (Id. at 509.) Erwin underwent a trigger point injection procedure to inject lidocaine into his lumbar paraspinal area, and tolerated the procedure well. (Id. at 507.) Dr. Oken gave his impression of Erwin's condition as stemming from a disc bulge and two disc protrusions. (Id. at 508.) He recommended that Erwin engage in a half-day pain management program involving physical therapy, functional conditioning, psychology, and education. (Id.)

At least two of Erwin's treatment providers reported that prolonged sitting causes him significant discomfort. In October 2009, Dr. Lynn Rader observed that sitting for more than 90 minutes causes Erwin to experience tingling in his left leg. (Id. at 480.) In more current clinical notes, dated January 18, 2010, licensed clinical social worker Linda Benton stated that Erwin "is not able to sit for more than an hour." (Id. at 476.) She noted that his back pain "seriously affected his life and greatly reduced his ability to function in most areas," despite his being "very cooperative and compliant with all recommendations from healthcare providers." (Id. at 477.)

**B.     Erwin's Hearing Testimony**

During his hearing before the ALJ, Erwin described the extent of his back pain and how it affects his daily activities. He testified that he cannot sit for longer than a half hour, stating that sitting "feels like you're sitting on a golf ball." (A.R. 42, 46.) Erwin emphasized

his back pain, explaining that he has spasms in the middle of his back with pain that radiates down to his tail bone.  (Id. at 42.)  He further testified that his pain is unpredictable and "bounces all over the place," explaining that "there's days you can't stand, there's days you can't sit.  You got to lay down, there's days you can't lay down.  You got to stand."  (Id.)  He explained that the pain medicine his doctors have prescribed "just knocks the edge off" his pain, but does not "do a lot" to help.  (Id.)  In response to the ALJ's questions regarding his endurance, Erwin testified that he is able to walk a quarter of a mile, lift 20 pounds, and stand for 15 minutes.  (Id. at 46.)  He described experiencing numbness in his leg while walking or bending, and explained that the numbness sometimes interferes with his balance.  (Id. at 48.)  Reaching also causes him pain, which "feels like I have glass inside my back."  (Id. at 49.)  The pain also interferes with his sleep, making it difficult for him to sleep for more than four hours.  (Id. at 51.)  Erwin explained that the most comfortable position for him is to lay down, propped up with pillows.  (Id. at 58.)

As for his daily activities, Erwin testified that he receives help from others in taking care of his own needs.  (Id. at 53.)  For example, his daughter and his mother help him with chores like doing the dishes and taking out the trash.  (Id.)  He cooks his own meals and does the dishes himself only rarely.  (Id. at 52.)  His hygiene is spotty—he only takes a shower when he knows he has to leave the house.  (Id. at 51.)  Shaving is also difficult because his back "goes into a spasm" when he leans in to watch himself in the mirror.  (Id. at 51-52.)  The ALJ questioned Erwin about his hobbies, which include caring for three pets: a dog, a cat, and a bird.  Erwin testified that he walks his dog, but just "out to the grass," stating that

"she doesn't like to go far." (Id. at 47.) He explained that he uses a computer to use Facebook and to use Photoshop, but only in limited stints. (Id. at 50-51.) According to Erwin, his computer sessions only last from five to ten minutes. (Id. at 50.) In response to the ALJ's questioning about recreational activities, Erwin said that he visited Rockford once in the summer of 2009 with a friend where they went for a walk, during which he had to take breaks to sit down. (Id. at 54-55.) He also works a three-hour volunteer shift answering phones at the Red Cross on Thursdays and Fridays. (Id. at 542.) He described the volunteer work as being undemanding, explaining that the office is "really not that busy," and that the phone only rings a few times during his shift. (Id. at 543.) Erwin emphasized that because it is volunteer work, he has the freedom to get up and walk around during his shift when sitting becomes painful. (Id.) He also emphasized that after just one three-hour shift, he feels "pretty wiped out," and after two days of work, he is "useless." (Id. at 544.)

## C.     The Vocational Expert's Testimony

The ALJ also solicited testimony from vocational expert ("VE") Leanne Care. The ALJ first asked Care to consider whether an individual of Erwin's age, education, and work experience who is limited to standing or walking a total of two hours and sitting for at least six hours in an eight-hour day could perform any jobs. (A.R. 549.) Care explained that such an individual could perform sedentary work, including as an order clerk, a telephone clerk, or an account clerk. (Id.) Care explained that if the claimant had to change positions after an hour, that would reduce the number of available jobs by 50%, and if he were off-task for 20% of the work day because of pain, that would preclude competitive employment. (Id. at

549-50.)  Care testified that missing four or more days of work a month would also preclude competitive employment.  (Id.)

**D.    The ALJ's Decision**

After hearing the proffered evidence, the ALJ concluded that Erwin is not disabled under sections 216(i) and 223(d) of the Social Security Act.  (A.R. 30.)  In so finding, the ALJ applied the standard five-step sequence, *see* 20 CFR § 404.1520(a), which requires her to analyze:

> (1) Whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet the listings, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e).  The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work.   20 C.F.R. § 404.1520(f),(g).

Here, the ALJ found at step one that Erwin has not engaged in substantial gainful activity since his alleged onset date, November 21, 2007.  (A.R. 26.)  At step two the ALJ determined that Erwin has severe impairments consisting of "degenerative disc disease of the

lumbar spine, history of compression fractures at T11 and T12 and history of ACL tear with surgical repair." (Id.) At step three the ALJ determined that Erwin is capable of sustaining a reasonable walking pace and carrying out activities of daily living, and thus concluded that his impairments did not meet or medically equal any listed impairment. (Id. at 24-25.)

There is some ambiguity in the ALJ's determination of Erwin's RFC at step four. In the heading numbered "5," in which the ALJ first declares Erwin's RFC, the ALJ determines that Erwin "has the residual functional capacity to perform *light work*," with the following limitations: "never climb ladders, ropes or scaffolds; occasional climbing ramps/stairs, balance, stoop, crouch, kneel and crawl; avoid concentrated exposure to work hazards; sit-stand option allowing him to stand after one hour of sitting; and no more than frequent reaching bilaterally." (Id. at 27) (emphasis added). In the ensuing discussion and RFC analysis, however, the ALJ never refers to light work, but rather describes Erwin as being limited to "sedentary work." (Id. at 27-28.)

To support her conclusion that Erwin is capable of sustaining work (be it sedentary or light), the ALJ acknowledged Erwin's testimony that "sitting and standing exacerbate his pain," but focused on his description of his daily activities as evidence that he is not disabled. (Id.) She observed that Erwin's daily activities include caring for his pets and taking care of "personal hygiene, shopping, and watching TV and reading," and cited his volunteer and computer activities as evidence that he can engage in employment. (Id.) The ALJ also stated that "the actual medical record does not support the extent of the claimant's alleged limitations," noting that Erwin's knee recovered from surgery and that "[t]esting does not

10

support the extent of the claimant's alleged back limitations." (Id. at 28.)  In assessing Erwin's credibility, the ALJ wrote that "the claimant's statements regarding the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Id. at 27.)  The ALJ also determined that "even the claimant's own testimony and reports do not support a disabling impairment as they describe at least sedentary work." (Id. at 28.)  After finding that Erwin is not capable of performing any of his past relevant work, at step five the ALJ concluded that Erwin is able to perform other jobs that exist in significant numbers in the national economy.  (Id. at 29.)  Accordingly, the ALJ concluded that Erwin is not under a disability as defined by the Social Security Act, and denied his application for DIB.  (Id. at 30.)

## Analysis

Erwin raises two main challenges to the ALJ's decision in his summary judgment motion.  First, Erwin argues that the ALJ's RFC assessment did not take into consideration all the evidence of the case record, instead over-relying on her interpretation of his activities of daily living.  Second, Erwin argues that the ALJ failed to provide adequate reasons to support her credibility analysis and compounded the error by using boilerplate language that suggests that she made up her mind about his credibility only after she had determined his RFC.

This court reviews the ALJ's decision only to determine whether substantial evidence supports the decision and to ensure that no error of law occurred.  *See* 42 U.S.C. § 405(g);

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). Although a decision denying benefits need not include a discussion of every piece of contrary evidence, if it lacks an "adequate discussion of the issues," it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (per curiam). An adequate discussion of the issues is one that contains "enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In other words, the ALJ must explain her decision with specific reasons that are supported by the record, building "a logical bridge" between the evidence and her conclusion. *Villano* 556 F.3d at 562.

## A. The ALJ's Credibility Determination

Erwin argues that the ALJ's credibility determination must be reversed because, according to him, the ALJ found Erwin's testimony not credible without supporting that conclusion with specific reasons taken from evidence in the case record, in violation of SSR 96-7p. SSR 96-7p requires an ALJ who is assessing a claimant's credibility to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, [and] statements and other information provided by treating or examining physicians . . . about the symptoms and how they affect the individual." 1996 WL 374186, at *1 (July 2, 1996). The ruling makes it clear that an ALJ must do more than make a conclusory statement that the allegations are not credible or simply recite factors that are described in social security regulations. *Id.* at *2. Rather, the ALJ must provide "specific

reasons for the finding on credibility, supported by the evidence in the case record," providing a sufficient level of specificity for a reviewing court to understand "the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Here, the ALJ did not provide a cohesive explanation for her adverse credibility finding, but this court identified three statements that appear to convey the ALJ's analysis with respect to this issue. The first statement is nothing more than meaningless boilerplate. The ALJ states the oft-repeated line that: "[a]fter careful consideration of the evidence, the undersigned finds that . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (A.R. at 27.) The Seventh Circuit has criticized this exact language as being meaningless and unhelpful for it concludes that a claimant's statements are not credible *because* the ALJ considers them to be inconsistent with a pre-determined RFC. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012); *Shauger*, 675 F.3d at 696. This language "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not," instead of evaluating a claimant's credibility "as an initial matter in order to come to a decision on the merits." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). Overlooking such boilerplate raises the risk that the ALJ will ignore evidence that does not comport with a preconceived RFC and pick and choose evidence that does. *See Woodson v. Astrue*, 09 CV 8028, 2010 WL 3420219, at *5 (N.D. Ill. Aug. 27, 2010). Given the Seventh Circuit's warning that the exact statement the ALJ provided here is "hackneyed

language," that "adds nothing" to a credibility analysis, *see Shauger*, 675 F.3d at 696, the first reason the ALJ gave for disbelieving Erwin is no reason at all.

The second statement conveying the ALJ's credibility assessment is her comment that the "claimant's allegations were not persuasive" because the "actual medical record does not support the extent of the claimant's alleged limitations." (A.R. 28.) By way of explanation, the ALJ points out that Erwin's "knee recovered from surgery well within one year to the point that the claimant does not need further treatment." (Id.) But Erwin did not testify that his knee still causes him difficulty after the surgery; he claims to be disabled by debilitating back pain. There simply is no inconsistency between his testimony and the medical evidence related to his knee surgery.

The only reason the ALJ gives to support her conclusion that the record does not support his allegations regarding his back pain is her assertion that "[t]esting does not support the extent of the claimant's alleged back limitations." (Id.) But the ALJ does not describe what testing she is referring to and the only exhibit she cites in support of her assertion is Dr. Oken's evaluation of Erwin. (Id.) But that exhibit does not reflect that Dr. Oken conducted any testing, nor does he cite to any test results that are inconsistent with Erwin's complaints. (Id. at 507, 509.) It is true that earlier in the discussion the ALJ summarized some of the medical records, noting that his December 2007 MRI showed no "convincing evidence of acute abnormality" and that his May 2008 MRI showed that his degenerative disease was "stable." (Id. at 28.) But the ALJ does not specifically reference those tests in connection with her statement regarding credibility, let alone explain how they are inconsistent with his

14

reports of pain. Summarizing medical evidence is no substitute for actual analysis of medical evidence. *See Christie v. Barnhart*, 04 C 3787, 2007 WL 2198937, at *23 (N.D. Ill. Jan. 16, 2007). By not citing specific tests administered by specific doctors and explaining how those tests contradict Erwin's own testimony concerning his back pain, the ALJ fails to "make clear to the individual and any subsequent reviewers" what evidence she considered and how that evidence was weighed. *See* SSR 96-7p, 1996 WL 374186, at *2.

Even if the ALJ had complied with SSR 96-7p's specificity requirements by pointing to some identifiable test to support her conclusion that Erwin's test results do not match his pain descriptions is not a basis to discredit his testimony for an ALJ "may not discredit testimony of pain solely because there is no medical evidence to support it." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Villano*, 556 F.3d at 562; *see also* SSR 96-7p, at *1 ("individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence"). That is because "[t]he etiology of pain is not so well understood, or people's pain thresholds so uniform, that the severity of pain experienced by a given individual can be 'read off' from a medical report." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). So while it is permissible for an ALJ to say that a lack of medical confirmation of pain "'reduces my estimate of the probability that the claim is true,'" it is not proper for an ALJ "to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.'" *Parker*

*v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010). Here, given the lack of other reasons underlying the ALJ's credibility assessment, her evaluation falls into the latter camp.

The only other statement conveying the ALJ's credibility assessment is her statement that Erwin "claimed he spends only 5 to 10 minutes on the computer but this appears exaggerated given he uses it for Photoshop activities and to socialize on Facebook." (A.R. 28.) First of all, that characterization of the facts is inaccurate. Erwin initially testified that he moves away from the computer every five to ten minutes, but then clarified that before he goes to bed he will sit in front of it for a half hour to an hour. (Id. at 50.) It also overlooks the fact that Erwin admitted that it is difficult to use Photoshop in the brief increments that his pain allowed. The ALJ disregarded without explanation his testimony that he was merely "trying to learn Photoshop, and it makes it impossible, because I just can't sit there." (Id.) Second, before relying on a claimant's description of his daily activities to make a credibility finding, it is the ALJ's responsibility to "obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quotation omitted). But when Erwin described using Facebook and Photoshop during the hearing, the ALJ asked no questions to clarify whether and how that is possible in five to ten minute increments. If Erwin's testimony on this point seemed unbelievable to the ALJ, she should have further questioned Erwin during his hearing, rather than assume his remarks were exaggerated without providing additional support or reasoning. That absence of reasoning is especially problematic here, where the only other explanations for the ALJ's credibility finding are

similarly unsupported.  Because the ALJ failed to give a supported, detailed explanation for her decision to discredit Erwin's testimony, the case must be remanded so that she may reevaluate Erwin's credibility in compliance with SSR 96-7p.

**B.     The ALJ's RFC Determination**

Erwin also challenges the ALJ's analysis in concluding that he has the RFC for sedentary work.  He argues that the ALJ failed to explain how or why Erwin's description of his daily activities are consistent with her finding that he can sustain full-time, sedentary work.  He also argues that the ALJ over-relied on those descriptions to the exclusion of any analysis of the relevant medical evidence or doctors' observations, especially those supporting his claim that he cannot sit for prolonged periods.  Finally, he argues that the ALJ erred in failing to account for his incontinence and obesity in determining his RFC.

The ALJ's first error in determining Erwin's RFC may be nothing more than a typographical one, but it casts doubt on the adequacy of the RFC assessment from the outset. The ALJ concluded, in the heading introducing her RFC assessment, that Erwin is capable of performing "light work," an assessment that includes a restriction on Erwin climbing ladders, ropes or scaffolds, a sit-stand option that allows him to stand after one hour of sitting, and a limitation on more than frequent bilateral reaching.  (A.R. 27.)  But contrary to the heading, the ensuing discussion of her RFC decision makes clear that the ALJ considers him capable of performing only sedentary work.  Specifically, she concludes that Erwin's "activities of daily living . . . are consistent with sedentary work," and that his testimony and medical evidence describes "at least sedentary work." (Id. at 28).  Nowhere

in the RFC analysis does the ALJ elaborate on the initial finding of "light work" or provide any discussion to support the heading's light-work designation. But the waters are further muddied by the ALJ's step-five analysis, in which she recounts asking the VE whether jobs exist in the national economy for someone with Erwin's age, education, work experience, and an RFC for light work. She concludes based on the VE's affirmative answer that there are. This discussion lends further confusion to whether the ALJ considers Erwin capable of light or sedentary work, and why. Even if the discrepancy between a finding of light work and the ALJ's analysis is simply a scrivener's error, which this court might overlook in other cases, when combined with several other errors identified below it becomes emblematic of an insufficiently developed analysis connecting the record evidence to the ALJ's conclusions.

The first substantive error the ALJ committed in assessing Erwin's RFC is her failure to reconcile her finding that he can perform sedentary work with the specific contradicting evidence offered by Erwin during his testimony. SSR 96-8p requires an RFC assessment to include "a narrative discussion" that considers specific medical facts and nonmedical evidence, including the "individual's complaints of pain and other symptoms and the adjudicator's personal observations," although the ALJ is "not free to accept or reject that individual's complaints *solely* on the basis of such personal observations." SSR 96-8p, 1996 WL 374186, at *8 (July 2, 1996) (emphasis added). It also requires the ALJ to explain "how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" and to give "a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Sedentary work, even with a sit-

stand option allowing Erwin to stand after one hour of sitting, would still require him to sit down for most of the eight-hour workday.  But Erwin described significant difficulties in sitting for more than half-an-hour, testifying that the pain of sitting down felt like "sitting on a golf ball," and explaining that "there's days you can't sit."  (A.R. 42.)  In the section titled "Information About Daily Activities" in Erwin's disability report, Erwin states that he cannot "sit on any hard surface for more than 15 minutes at max, like a desk chair" and that when he does sit, he sits on something soft like a couch.  (Id. at 224.)

Erwin's testimony is buttressed by medical reports indicating that he would have difficulty sitting down for long periods during an eight-hour day.  In one clinic note Dr. Holz described Erwin as having "difficulty getting off and on the examination table," and being "unable to sit comfortably on the examination table."  (Id. at 358, 360.)  Dr. Holz also notes that "[g]oing from a seated to a standing position, he has difficulty with pain."  (Id. at 375.)  A psychosocial assessment by licensed clinical social worker Linda Benton states that Erwin "is not able to sit for more than an hour."  (Id. at 476.)  In an objective evaluation performed by a physical therapist, it was noted that "[a]ll hip mobility is painful around the hip joint and into the patient's low back"—movement that encompasses sitting.  (Id. at 393.)  According to Dr. Rader, sitting for more than 90 minutes causes tingling in Erwin's left leg.  (Id. at 480.)

In her RFC assessment, the ALJ does not analyze how Erwin's allegations of pain are consistent with full-time sedentary work nor does she explain how the medical records documenting that pain are consistent with her RFC finding.  Instead, the ALJ's assessment

19

vaguely states that Erwin's "testimony and reports . . . describe at least sedentary work." (Id. at 28.) That statement draws no connection between Erwin's substantive testimony and medical reports and the ALJ's conclusion. Without some positive account of how Erwin can reasonably be expected to perform sedentary work consistently for eight hours a day, five days a week, when he described experiencing entire days when he is incapable of sitting down, the ALJ's conclusion is lacking not only the narrative required by SSR 96-8p, but the logical bridge the Seventh Circuit has repeatedly required in Social Security decisions. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Parker*, 597 F.3d at 921; *Villano*, 556 F.3d at 562.

This court also agrees with Erwin that the ALJ over-relied on and mischaracterized his description of his daily activities in determining his ability to function in the workplace. The ALJ's RFC assessment rests almost entirely on her conclusion that Erwin's "activities of daily living cited at the hearing and the record . . . are consistent with sedentary work." (A.R. 28.) In explaining that conclusion, the ALJ noted that Erwin "goes to places like Rockford to walk on paths" and is able to care for himself and his pets. (Id.) The ALJ also emphasized that Erwin volunteers at the Red Cross two days a week answering phones. Pointing to those activities, the ALJ concluded that "even the claimant's own testimony and reports do not support a disabling impairment as they describe at least sedentary work." (Id.)

The Seventh Circuit has warned ALJs against casually equating "household work to work in the labor market." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). The "ability to struggle through the activities of daily living" does not necessarily mean that a

claimant "can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). That is because most daily activities differ from full-time jobs in an important way: "a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer." *Bjornson,* 671 F.3d at 647. Even a claimant's ability to engage in "brief, part-time employment" does not necessarily support a conclusion that he "was able to work a full-time job, week in and week out." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The court in *Bjornson* described the tendency to overlook these distinctions as "a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." 671 F.3d at 647.

In determining Erwin's RFC the ALJ did not explain how any of the daily activities she points to are reconcilable with the consistency and stamina required for full-time work, and she ignored much of the context of Erwin's testimony. For example, the ALJ cited Erwin's ability to care for his pets and himself as evidence of his ability to perform sedentary work, but failed to consider the fact that Erwin does not "care for himself." Erwin testified that he receives help cleaning his dishes from his daughter and her mother. (A.R. 53.) He asks visitors to take out the trash for him when they stop by. (Id.) The ALJ described Erwin as being able to take care of his personal hygiene, but when asked about his hygiene habits at the hearing, Erwin testified that he only takes a shower when he knows he has to leave the house, and that his back "goes into a spasm" when he leans in to shave. (Id. at 27-28, 52.) His testimony shows that he also has difficulty caring for his pets, in that he described

experiencing leg numbness when he bends down to grab his dog's bowl. (Id. at 48.) Because Erwin's family helps him with some of the more difficult tasks while Erwin focuses on others, he is able forego household chores and tasks like shaving according to his immediate pain level and mood—a level of daily flexibility full-time employment cannot promise. One of "the critical differences" between activities of daily living and a full-time job is the fact that one "can get help from other persons" in performing the former, but is expected to be self-sufficient in performing the latter. *See Bjornson*, 671 F.3d at 647. Here the ALJ erred in failing to consider the help Erwin receives in caring for himself and the difficulties he ascribed to his performance of other daily activities. *See id.*; *see also Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) (criticizing an ALJ for not mentioning that claimant received help from his aunt with household chores).

Also troubling is the ALJ's reliance on Erwin's description of a trip he took to Rockford, Illinois, as being indicative of his ability to hold a full-time job. As an initial matter, the ALJ appears to have mischaracterized Erwin's testimony. She describes Erwin as testifying that he "goes to places like Rockford to walk on paths and take pictures," suggesting this was an ongoing habit. (A.R. 28.) But Erwin testified to visiting Rockford only once, "last summer," with a friend. (Id. at 54.) The ALJ did nothing to determine whether this one-time visit happened on a day when his pain was unusually low or whether he was similarly active on other occasions. But the ALJ is tasked with considering whether the claimant has "good days," during which a claimant's pain is manageable and he can to work at a greater capacity, and "bad days," during which a claimant's pain is less manageable

and his work capacity suffers as a result. *Myles*, 582 F.3d at 678. A one-time trip may be consistent with the possibility that Erwin has good days, during which he is able to manage the pain caused by his medical condition, and bad days, when he is not. In fact, his physician said as much in a clinic note explaining that "some days are good and some days are bad," and Erwin explicitly testified that his pain "bounces all over the place." (A.R. 42, 360.) The vocational expert testified that being off-task 20% of the work day due to interfering pain "would preclude competitive employment." (Id. at 550.) But the ALJ did not attempt to determine how often Erwin experiences these good days compared to his bad days, and whether on bad days he could be on-task for 80% of the work day. *See Myles*, 582 F.3d at 678.

Finally, the ALJ erroneously conflated Erwin's twice-a-week volunteer work at the Red Cross with full-time gainful employment, despite the absence of evidence that the Red Cross requires a "minimum standard of performance" from its volunteers that would be expected in paid employment. *See Bjornson*, 671 F.3d at 647; *see also Jelinek*, 662 F.3d at 812-13. Erwin testified that he works a three-hour shift answering phones at the Red Cross on Thursdays and Fridays, during which the phone "only rings a few times." (A.R. 274.) He explained that the office where he volunteers is "really not that busy," allowing him the freedom to "get up and kind of walk around a little bit." (Id. at 543.) After just one three-hour shift, Erwin testified that he feels "pretty wiped out"; after two days of work, "I'm useless." (Id. at 544.) These two days of volunteering amount to only six hours per week, and because it is volunteer work, he is not required to attend consistently. According to SSR

96-8p, an RFC is "the individual's maximum remaining ability to do sustained work activities . . . on a regular and continuing basis . . . 8 hours a day, for 5 days a week." 1996 WL 374184, at *2 (emphasis omitted). Brief, part-time employment—let alone volunteer work—does not necessarily support a conclusion that one is able to perform full-time work, week in and week out. *See Jelinek*, 662 F.3d at 812. Instead, Erwin's work at the Red Cross reflects only a "willingness and ability to stay engaged in commendable but limited endeavors," on his own schedule and at his own pace. *Id.* at 812-13. Given the ALJ's errors in overlooking the evidence that Erwin cannot sit for prolonged periods and her over-reliance on his description of short-term, flexible, and inconsistent activities, this court concludes that a remand is warranted for the ALJ to reassess Erwin's RFC in accordance with SSR 96-8p.

On remand, the ALJ should also consider Erwin's argument that his obesity and incontinence contribute to his disability. As he points out, "an ALJ is required to consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Although the evidence that incontinence interferes with his ability to function seems fairly limited, several of his doctors referenced his obesity and suggested that his weight exacerbates his back pain. (*See, e.g.*, A.R. 283, 324-25.) On remand, the ALJ should consider whether—and if so, how—Erwin's incontinence and obesity impact his ability to function in the workplace.

## Conclusion

For the foregoing reasons, Erwin's motion for summary judgment is granted and this case is remanded for further proceedings consistent with this opinion.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**